JOHN N. ORINGDERFF and BARBARA ORINGDERFF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, RespondentOringderff v. CommissionerDocket No. 3879-77.United States Tax CourtT.C. Memo 1979-93; 1979 Tax Ct. Memo LEXIS 430; 38 T.C.M. (CCH) 402; T.C.M. (RIA) 79093; March 19, 1979, Filed William P. Trenkle, Jr. and Jack E. Dalton, for the petitioners. Dale P. Kensinger, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1973 and 1974 in the amounts of $145,507.14 and $30,052.32, respectively. The issue for decision is whether petitioners' transactions in commodity futures during 1973 and 1974 resulted in capital losses or ordinary losses. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, John N. and Barbara Oringderff, who resided in Ingalls, Kansas at the time*432 of filing their petition in this case, filed joint Federal income tax returns for the calendar years 1973 and 1974 with the Internal Revenue Service Center in Austin, Texas. Mr. Oringderff (hereinafter referred to as petitioner) is known for his expertise in feedlot management. He is an expert in the fattening of feeder cattle and the marketing of fat cattle. He was born and raised on a farm in southeast Kansas where he was involved in farming activities. His farming activities continued during his education at a local junior college. After junior college, petitioner served in the military. Upon his return to civilian life, petitioner attended Kansas State University where he earned a Bachelor of Science degree in Animal Husbandry. Upon graduation, petitioner entered the cattle industry as a commercial feedlot manager. For a fee, commercial feedlots custom feed cattle owned by others. The cattle enter the feedlot weighing between 550 and 650 pounds, for heifers, and between 600 and 800 pounds, for steers. After feeding for an average of 120 to 150 days, the cattle weigh between 1,000 and 1,300 pounds and are generally ready to be sold to packers. Packers are enterprises, *433 such as Iowa Beef Processors, Inc., Swift and Company or Armour and Company, which need large quantities of finished cattle. When the cattle begin the fattening process, they are called feeders; when sold, they are called finished or fat cattle. While in the feedyard, the cattle are kept in small pens, 200 to 300 square feet per animal, and are fed high energy grains, such as wheat and corn. Depending on where in their growth cycle they stand, the cattle are fed one of numerous ratios of the high energy feed. Petitioner's first position following graduation from college was managing a small, 2,000-head feedyard in Dodge City, Kansas. He held that position from 1959 until September of 1961. In September of 1961, he was hired to manage a new feedyard in Ingalls, Kansas - the Ingalls Feedyard, Inc. (Ingalls Feedyard). At that time Ingalls Feedyard had a capacity for 2,500 head of cattle. In 1962, petitioner and the assistant manager from the Ingalls Feedyard organized a corporation, R & O Cattle Company. Each owned 50 percent of the stock in the corporation, which was in the business of buying feeder cattle to be fattened and sold. R & O Cattle Company placed cattle with Ingalls*434 Feedyard and paid Ingalls Feedyard the same fee as other customers to fatten its cattle. The shareholders of Ingalls Feedyard encouraged its employees, or entities in which they held an interest, to purchase feeder cattle and place them with Ingalls Feedyard for fattening. During the time from 1961 until 1967, the commercial feedlot industry grew greatly in southwest Kansas and the plains area. The Ingalls Feedyard capacity grew to 11,000 by 1967. In the fall of 1967, the 5 shareholders of Ingalls Feedyard decided to expand their enterprise. By the fall of 1968, Ingalls Feedyard had a 30,000-head capacity. Additionally, a new mill and new offices were added to the operation. In the late 1960's, petitioner entered a partnership, Irsik & Doll, with the 5 shareholders of Ingalls Feedyard. Petitioner had a one-sixth interest in the partnership. The partnership was in the business of buying feeder cattle to be fattened and sold as fat cattle. Petitioner also entered the business of buying feeder cattle to be fattened as an individual in 1967. The partnership cattle and petitioner's own cattle were placed at Ingalls Feedyard for fattening at the same fee charged to other customers.*435 In 1967, petitioner began trading in cattle futures. The other R & O Cattle Company shareholder was unwilling to have the corporation engage in futures transactions and the other partners of Irsik & Doll were not agreeable to having the partnership engage in such transactions. Ingalls Feedyard was not expanded beyond the 30,000-head capacity of 1968, because the corporate management determined that further expansion would be inefficient. However, the 5 shareholders of Ingalls Feedyard and petitioner formed a separate corporation and started a second feedyard, Gray County Feedyard, Inc. (Gray County), with a 20,000-head capacity. The Gray County operation began in the late 1960's. Petitioner in 1973 and 1974 supervised the cattle sales and purchases made by the manager for that feedyard. Petitioner's interests in the above operations continued through 1974. He was manager of Ingalls Feedyard; partner of Irsik & Doll; a shareholder in R & O Cattle Company; a shareholder in, and a consultant to, Gray County; and, an individual participant in the business of fattening feeder cattle for sale to packers. In the late 1960's and early 1970's, because of the expansion of the commercial*436 feedlot industry in southwest Kansas, buyers from the major packers began to purchase directly from the feedlots. Previously, the buyers could be found only in terminal markets such as Kansas City or St. Louis. Buyers who are representatives of the packers travel a given territory to buy grain-fed cattle for the packer. Typically, a buyer will go to a feedlot and, upon finding a supply of finished cattle on hand, will bid on the cattle or request an estimated asking price. At this point, the feedlot management will get in touch with the owner of the cattle in question. The owners of the cattle being fed in Ingalls Feedyard generally depended on petitioner, the feedlot manager, to advise them as to what was or was not a good price. Although a buyer is given up-to-date price information at the beginning and middle of his workday and upon reporting into his company during the day, petitioner due to his contacts in the futures market had price information at least as current as the buyer's. 1 This information was advantageous to petitioner in the sale of his own cattle and in the advice he gave to customers of Ingalls Feedyard on the sales of their finished cattle. *437 The cattle industry is cyclic both in terms of numbers of cattle placed on the market and prices for cattle. In 1973, the industry was in a stage of preparing for rapid expansion. Owners were withholding heifers from the market and not culling cows so as to increase future production. In addition to this contraction of available cattle preparatory to rapid expansion in number of cattle available, other factors affected the cattle market in 1973 and 1974. There were wheat sales to the Soviet Union beginning in 1972, which caused grain prices to rise. Inflation was at a high level and was being increased by spiraling energy costs. In late 1973 and early 1974, weather conditions increased the cost of putting gain on feeder cattle.With cattle prices rising and a temporary short supply of cattle, sporadic consumer boycotts of meat began in February of 1973. In March of 1973, the President of the United States imposed a price ceiling on red meats at the retail and wholesale levels. Two weeks after price controls began, hoarding of meat occurred. In September of 1973, the ceiling on beef was removed. The price of other red meats had increased when the ceiling on prices was removed*438 in July, and cattle owners had expected an increase in cattle prices when the price ceiling was removed in September. However, the price immediately dropped when the ceiling was removed. In December of 1973 and February of 1974, a truck strike occurred. In general, the period of 1973 and 1974 was one of great uncertainty in the cattle industry. Although generally cattle owners made profits through the first three quarters of 1973, losses became prevalent in the fourth quarter of 1973 and through 1974. It was not unusual for a cattle owner to experience a loss amounting to $100 to $150 a head at times in 1974, and in some instances, even a greater loss. Because there is a large price risk in raising feeder cattle, some owners have used the futures market in commodities to reduce their risks. When feeder cattle are purchased to be fattened, the owner is taking a long position in the cash feeder cattle market. For protection against a price decline, the owner can take a short position in the futures finished cattle market by selling a finished cattle futures contract. Assuming uncontrollable variables, such as weather, feed costs, and death rates, are as expected, the owner*439 by taking a short position in the futures market has locked-in his profit even if prices fall. On the other hand, if prices rise, the owner has limited his profit to the locked-in figure and does not profit from a market upsurge. If that same owner, with a long position in the cash finished cattle market, is concerned not with the price he will ultimately receive for his cattle, but is concerned with the feed costs he might incur, he could take a long position in the futures grain market by purchasing a grain futures contract. Thus, if grain prices did increase, the owner would be protected. But, if grain prices went down, he would not increase his profit on the cattle because of the lower prices. Often, a cattle owner upon the sale of the finished cattle, will purchase feeder cattle and begin the process anew. Where this is an owner's practice, he may wish to protect himself from rising feeder cattle prices. Today, for that protection, the owner takes a long position in the futures feeder cattle market by purchasing a feeder cattle futures contract. In 1973 and 1974, however, the feeder cattle futures market was not a viable hedging device due to the small volume of feeder*440 cattle futures trading. Thus, if an owner wanted cost protection for replacement feeder cattle prior to 1974, he would have to rely on a correlation between feeder cattle prices and finished cattle prices, and take a long position in the finished cattle futures market. Finished cattle futures positions consist of 40,000 pounds live weight or approximately 37 head of cattle. As mentioned above, petitioner's futures trading began in 1967 when he took a small number of short positions in the finished cattle futures market. In each year from 1967 through 1974, petitioner on his Federal income tax returns treated his futures transactions as resulting in ordinary income or ordinary loss. Petitioner's 1972 return was audited by the Internal Revenue Service and he agreed with the revenue agent's recharacterization of his losses as capital, which caused him to pay more tax. Petitioner agreed to the proposed adjustment because so little money was involved that he did not consider the proposed change worth contesting. Petitioner, and not any of the entities with which he was involved, always paid the commissions on his futures market trades. In 1973 and 1974, petitioner made the following*441 futures transactions: 1973(CORN, WHEAT, SUGAR & HOGS) DateNumber ofContractContractOpenedContractsMonthPricePositionCorn3-125July$ 1.55-3/4L3-125July1.56LWheat3-3010September2.01LCorn6-2120December1.99LHogs6-151April38.15S6-152April38.25S6-152April38.30SSugar7-261October9.96L7-261October10.03LHogs3-074April1974(CORN)Corn8-0510December3.40L8-0510December3.50LDateClosingGain orDaysClosedPrice(Loss) *HeldCorn5-021.67515-021.67$ 1,112.5051Wheat5-022.171,496.0033Corn6-252.03680.004Hogs6-2641.90116-2641.90116-2641.90(2,275.00)11Sugar8-218.50268-218 .50(3,472.80)26Hogs3-07209.001974(CORN)Corn8-083.5038-083.50878.0031973SAUL STONE AND COMPANY (Finished Cattle) DateNumber ofContractContractOpenedContractsMonth *PricePosition1-035April$41.42-1/2S1-035February41.42-1/2S1-175June43.55L1-235August44.17-1/2S1-185February43.35S1-265February1-115April41.92-1/2S1-1610April43.30S1-164April43.45S1-165April43.45S2-0220February1-2910February42.97-1/2L1-3010February43.17-1/2L1-312February43.62-1/2L2-012February44.60L2-0210February44.95L2-0510February44.60L1-315February42.70L2-0710June42.87-1/2L2-0510February44.60L2-0728February43.85L2-1 45June2-205June2-2110April44.22-1/2L2-135June43.80L2-0210August43.75L2-235 June2-275June45.55L3-0210April3-0 210June3-0720June3-058April45.15L3- 0512April45.25L3-052June45.07-1/2L3-058June45.10L3-0510June46.25L3-155August3-1510August3-1920April46.62-1/2L3-3010April45.02-1/2L3-1210June46.90L3-163June46.80L3-1611June4 6.85L3-167August45.92-1/2L3-1613August46.00L3-2210August44.95L4-061June42.55L4-061June42.57-1/2L4-063June42.60L4-065August42.37-1/2L4-173June04-175August4-165June42.95L4-172June43.10L4-175August43.20L4-2410December42.75L4-2710December4-198June43.30L4-2610June43.92- 1/2L4-261June44.00L5-1010June5-1110June5-1122June5-115June5-113June5-1110December5-1710June5-085June45.22-1/2S5-0913June45.20S5-156June45.70S5-238June47.20L5-245June47.12-1/2S5-3012June47.10S5-307June47.15S6-065August6-062October6-062October6-0 61October6-1110August47.25L6-1110August47.35L6-2625December6-295August6-1810August47.17-1/2S6-215August47.30S7-1720August50.30L7-1720October50.40S7-2510August7-315December7-315December8-061August8-064August8-175December8-285February52.37-1/2L8-3010February8-075October58 .70L8-155October59.80L9-1210February50.75L10-0810February10-082February9-1310December47.20L9-1415December46.55L10-1010December10-0920December46.55S10-1710December45.12-1/2L10-1910December45.15L10-2415February10-3112December10-311December10-2910December41.95S10-2916December41.95S10-294December41.95S10-0820February50.60L10-175February48.00L10-175February48.00L11 -272December41.47-1/2S11-273December41.47-1/2 S11-304February45.60L12-125February45.30L*442 DateDateClosingGain orDaysOpenedClosedPrice(Loss) **Held1-031-04$41.30$ 50.0011-031-0541.55(450.00)21-171-2443. 80500.0071-231-2443.07-1/21,800.0011-181-2642.82-1/281-261-261,350.0001-111-26n(1) 42.22-1/2n(4) 42.45151-161-2642.45101-161-2642.452,955.00101-161-3143.10500.00152-022-021,500.0001-292-0644 .3581-302-0644.3571-312-0644.3562-012-0644.5052-022-0644.5042-052-064 4.506,420.0011-312-0643.00600.0062-072-0843.251,100.0 012-052-0944.40(1,200.00)42-072-1444.859,955.0072-1 42-14700.0002-202-20175.0002-212-2244.47-1/21 ,000.0012-132-2244.801,000.0092-022-2243.80200.00202-232-23425.0002-272-2845.75200.0013-023-02200.0003-0 23-02700.0003-073-071,900.0003-053-0846.2533- 053-0846.257,520.0033-053-0846.2533-053-0846.2533-053-0846.258,220.0033-153-1503-153-151,495.0003-194-0443.60163-304-0443.62-1/2(29,800.00)53-124-0442.40233-164-0442.40193-164-0442.40(42,860.00)193-164-04193-164-04(9) 42.00193-224-04(21) 42.02-1/2(43,380.00)134-064-1242.7064-064-1242.7064-064-1242.70230.0064-064-1242.6050.0064-174-17300.0004-174-17100.0004-164-18(4) 43.17-1/224-174-18(3) 43.52-1/2930.0014-174-1843.60320.0014-244-2743.7 034-274-273,750.0004-194-3044.22-1/2114-264-3044.22-1/244-264-3044.22-1/23,490.0045-105-10(350.00)05-115-1105-115-1105-115-1105-115-1 1(1,160.00)05-115-11(50.00)05-175-17(1,250.00)05-085-23155-095-23(15) 47.17-1/2145-155-23(9) 47.20(18,760.00)85-235-24(4) 47.10(4) 47.12-1/2(600.00)15-246-04115-306-04(20) 47.62-1/265-306-04(4) 47.67-1/2(5,890.00)66-066-06250.0006-066-0606-066-0606-0 66-06110.0006-116-1347.0006-116-1347.0 0(3,200.00)06-266-263,375.0006-296-29(875.00)06-187-0547.72-1/2176-217-0547.72-1/2(3,650.00)147-177-2050.72-1/22,600.0037-177-2051.80(12,000.00)37-257-251 ,750.0007-317-3107-317-311,300.0008-068-0608-068-06(15.00)08-178-17475.0008-288-30 52.37-1/228-308-30(1,550.00)08-079-0646.25308-159-0648.30(48,300.00)229-129-13(8) 50.951(2) 50.00440.00110-0810-08010-0810-081,640.0009-1310-09(23) 46.50269-1410-09(2) 46.55(4,060.00)2510-1010-102,550.00010-0910-1745.12-1/210,600.00810-1710-23(6) 42.52-1/2610-1910-23(14) 42.55(21,560.00)410-2410-2475.00010-3110-31010-3110-31(2,945.00)010-2911-0242.95410-2911-024 3.00410-2911-0243.65(13,440.00)410-0811-0246.502510-1711-0246.55(37,900.00)1610-1711-0745.45(5,300.00)2111 -2711-2841.25111-2711-2841.30190.00111-3012-0444.05(2,640.00)412-1212-1445.45100.002*443 1973PACKERS TRADING COMPANY(Finished Cattle) DateNumber ofContractContractDateClosingGain orDaysOpenedContractsMonthPricePositionClosedPrice(Loss) *Held1-035February41.85S1-0441.42-1/2(1,050.00)11-112February42.40L1-12(1) 43.22-1/2(1) 43.25670.0011-112April42.05S1-1242.40(340.00)11-163February43.22-1/2S1-2344.40(1,530.00)71-315February43.80L2-0644.57-1/21,350.0072-072February43.70L2-0843.95120.0012-085Apr il43.00L2-0943.50800.0012-213April44.20L2-2244.32-1/230.0013-192April46.47-1/2L3-2843.57-1/2(2,400.00)93-194April46.47-1/2L4-04(3) 43.95(1) 44.32-1/2(4,050.00)164-042April44.32-1/2S4-0543.15860.0014-062April43.72-1/2L4-1044.45500.0044-242December42.95L4-2542.95(80.00)14-302June44.32-1/2S5-0 344.10100.0045-242June47.05L5-2947.2040.0056-064October47.05S6-0846.92-1/240.0026 -224August47.55S7-0548.90(2,320.00)1310-042February10-04010-042February10-041,140.00010-172December45.12-1/2L10-2243.47-1/2(1,400.00)510-312December43.30S11-0741.37- 1/21,540.00811-161February11-16185.00011-262February48.25S11-2946.201,560.00311-302February11-30(230.00)0*444 1973SAUL STONE AND COMPANY (Finished Cattle) DateNumber ofContractContractOpenedContractsMonthPricePosition1-164April43.30S1-161April43.32-1/2S1-294February42.97-1/2L1-291February43.00L1-303 February43.20L2-012February44.60L2-025February45.00L2-078February44.25L3-055April45.25L3-055June4 5.15L3-165June46.85L3-165August46.02-1/2L5-091June45.10SDateDateClosingGain orDaysOpenedClosedPrice(Loss) *Held1-161-2642.45101-161-2642.451,510.00101-292-0644.3581-292-0644.3581-302-0644.3582-012-0644.503,640.0052-022-14(3) 44.80122-072-14(10) 44.851,040.0073-053-0846.2533-053-0846.253,800.0033-164-0442.40193-164-0442.00(17,350.00)195-095-1145.15(60.00)2*445 1973PACKERS TRADING COMPANY(Finished Cattle) DateNumber ofContractContractOpenedContractsMonthPricePosition1-035February41.42-1/2S1-122February 1-123February1-163February43.22-1/2S1- 185February1-196February1-195April1-191April1-292February1-291February1-292February2-025February44.80L2-071February2- 075February2-085April43.02-1/2L2-121February44.82-1/2 L2-122February44.87-1/2L2-213April44.20L2-266April2-276April3-063April3-125June3-285August43.07-1/2L4-094April43.90L5-154June45.70S5-184June5-171August45.97-1/2S5-173August46.00S5-242June47.07-1/2L5-305June47.10S6-0 72October6-072October6-115June6-114August47.35L6-144August6-214August6-214August7-164December50.75L8-064August8-222February57.80L8-274December53.55L9-124December9-174December45.85L9-171December45.87-1/2LDateDateClosingGain orDaysOpenedClosedPrice(Loss) *Held1-031-0441.85(867.50)11-121-1201-121-12733.7501-161-1843.17-1/260.0021- 181-18283.2501-191-191,080.0001-191-1901-191-19(425.00)01-291-2901-291-2901-291-29283.7502-022-0644.32-1/2(952.50)42-072-0702- 072-07408.5002-082-0943.50947.5012-122-1344.4512-122-1344.45(491.50)12-212-2244.32-1/ 2148.5012-262-26838.5002-272-27(241.50)03-063-062 09.2503-123-12198.7503-284-0442.35(1,452.50)84-094-10(1) 44.05(3) 44.45718.0015-155-1746.30(962.00)25-18479.0005-175-2346.67-1/265-175-2346.67-1/2(1 ,092.00)65-245-2947.2099.0055-306-0547.42-1/2(652.50)76-0 76-0706-076-07659.0006-1198.7506-116-1347.05(482.00)26-146-14319.0006-216-2106-216-21(181.00)07-167-2052.552,878.0048-068-06639.000 8-228-2355.12-1/2(2,141.00)18-278-2851.32-1/2(3,562.00)1 9-129-12879.0009-179-2141.4049-179-2141.40(8,912.50)4*446 1974SAUL STONE AND COMPANY (Finished Cattle) DateNumber ofContractContractOpenedContractsMonthPricePosition1-175June54.90L2-148April2-083August52.15S2-157August2-229August2-255April1-082 April54.75L1-161April55.10L1-162April55.12-1/2L1-175April55.35L2-0810August49.30L2 -082August52.15S1-305June54.10L5August4-195June46.20L5-235October5-245 August40.05S5-162October40.70L5-173October41.20L6-202October6-211August6-211October6-142October35.55L7-222August7-222October7-092August45.00L7-102October44.00L7-222October48.60L7-243October47.65L8-012October49.72-1/2L8-092October48.35L8-122October47.50L9-032December38.30L9-061December39.30L11-124April39.45L11-182February10-092December 43.95L11-202February41.20S11-202April41.75S 11-262February40.50L12-021February40.87-1/2L12-021February40.90L12-202April*447 DateDateClosingGain orDaysOpenedClosedPrice(Loss) *Held1-171-1854.70(600.00)12-142-14440.0002-082-15(1) 53.55(1,560.00)7(2) 53.402-152-15215.0002-222-221,755.0002-252-25(525.00)01-083-0143.60511-163-0143.60431-163-0143. 60431-173-0143.60(47,040.00)422-083-0152.1511,400.00202 -083-0547.753,440.00251-304-0946.10(16,400.00)693,100.004-195-1742.65(7,300.00)285-235-23(1,445.00)05-246-0637.205,500.00135-166-0735.65215-176-0735.65(10,900.00)206-206-20250.0006-216-21240.0006-216-2120.0006-146-2639.503,080.00127-227-22560.0007-227-22700.0007-098-0750.003,920.00297-108-2743.90497-228-2743.90377-248-2743.90358-018-2743.90278-098-2743.90198-128-2743.90(20,265.00)169-039-1138.3089-069-1138.30(535.00) 511-1211-1440.05(1,140.00)211-1811-18820.00010-0911-2038.80(4,210.00)4211-2011-2140.60480.00111-2011-2141.05380.00111-2611-2941.55750.00312-0212-1043.00812-0212-1043.001,600.00812-2012-2020.000*448 1974PACKERS TRADING COMPANY(Finished Cattle) DateNumber ofContractContractOpenedContractsMonthPricePosition1-141February51.55L1-141February51.80L1-282February50.20S1-151April54.70L1-151April54.7 5L3-052June45.90L3-152April3-262June6-141October35.40L7-292August48.40L7-111October42.97-1/2L7-152October44.50L7-171 October46.00L7-231October48.70L7-241October49.00L8-022October48.72-1/2L8-052October50.65L8 -094October48.12-1/2L8-191October46.17-1/2L8-264October46.20L8-262October44.80L10-113December43.00L10-232December43.45LDateDateClosingGain orDaysOpenedClosedPrice(Loss) *Held1-141-1552.2511-141-1552.25380.00 11-281-2949.00880.0011-152-0849.90241-152-0849.90(3,940.00)243-053-0646.00013-153-15270.0003-263-26310.0006-146-1838.601,240.0047-297-3047 .45(760.00)17-117-3049.20197-157-3049.20157-177-3049.20137-237-3049.2077-247-3049 .207,490.0068-028-0751.0058-058-0751.001,920.0028 -098-1449.42-1/21,900.0058-198-2842.6598-268-2842.6528-268-2842.65(9,045.00)210-1110-1844.001,065.00710-2311-1236.95(5,290.00)21*449 In 1973 and 1974, petitioner made the following cattle transactions: 1973No. ofNo. ofSellingDateCattleCost ofDateCattle SoldPriceProfit orPurchased(Feede)CattleSold(Finished)of Cattle(Loss) *6-20-72205$56,264.491-02-73203$ 88,609.92$2,309.467-18-7215647,498.991-08-7315570,597.752,799.536-21-7212432 ,451.061-09-7312457,302.367,581.218-03-7216150,377.081-20-7315977,054.736,142.948-07-7211036,6 02.291-23-7310956,997.385,458.128-17-7212640,054.491-28-7312562,285.786,042.637-21-7212030,787 .712-12-7311953,580.976,315.499-25-7211836,253.712-22-7311854,157.654,696.7810-19-7211538,159. 763-29-7311562,481.179,206.6510-03-7226982,360.474-13-73267131,403.869,675.2912-05-729831,652. 455-08-739848,201.634,450.2711-30-7211235,470.965-09-7311054,954.504,547.711-19-7313149,493.95 6-11-7313174,496.477,788.082-03-739933,885.606-27-739955,493.628,807.962-03-7312436,914.217- 04-7312462,048.939,650.102-03-7316549,739.007-06-7316584,187.349,927.001-03-7311139,996.836-06 -7311161,920.284,867.041-04-7312038,052.617-08-7311762,127.864,480.123-01-7324188,524.159-09-7 3241149,406.6818,280.951-11-7317344,820.829-10-7317394,363.8814,963.503-19-7314044,692.2411-13 -7313761,796.86(16,665.42)5-01-7311846,525.1411-14-7311857,080.44(15,047.33)5-17-7314757,901.2711-28-7314668,741.22(20,574.04)5-24-7312846,436.6411-28-7312860,695.32(13,787.27)6-29-7313954,5 16.9612-14-7313765,564.63(18,219.94)6-25-7314254,760.1712-14-7314268,383.67(16,778.70)5-15-73120$43,481.631-09-74120$ 63,640.80[10,789.54)7-05-7314249,934.611-21-7414084,614.423,793.415-14-7315647,196.381-24-7415691,426.264,400.067-21-7313748,319.672-15-7413775,953.23(4,043.33)12-01-73 9134,286.005-09-749046,795.78(6,443.43)1-08-7410142,148.056-21-7410146,556.36(18,137.66)12-19- 7311141,597.826-21-7411052,885.18(16,250.93)11-22-739322,087.717-06-748838,365.95(4,066.16)1-0 9-7412241,490.187-22-7412064,704.47(5,312.71)1-24-7410235,193.828-13-7410264,458.802,382.573-0 7-7410328,114.608-27-7410259,218.308,292.854-01-7420074,434.289-05-74200111,032.60(3,501.17)4- 12-7411640,621.279-06-7411659,178.58(1,154.15)4-22-749834,825.029-15-749747,333.00(4,557.46)4- 22-749835,455.429-15-749647,288.20(5,203.26)3-21-745916,295.2110-05-745927,964.97(3,566.66)4-2 2-7419966,438.6010-23-7419991,000.06(22,175.76)4-10-745213,530.0411-10-7451-1/224,717.76(2,933.31)5-16-7411226,475.4511-13-7411249,814.03(3,221.45)6-27-7412231,971.7311-15-7412253,801.50(2, 885.17)7-18-7410714,688.6312-16-7410724,286.58(2,909.00)7-04-7410529,092.7512-16-7410546,501.43(7,572.83)8-17-7410717,503.3512-26-7410725,538.93(7,266.01)8-22-749028,380.5512-26-748942,094.86(3,754.56)10-03-74100$26,947.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$ 42,580.64(4,524.62)9-26-7421652,995.092-18-7521589,839.54(14,978.38)10-10-747017,979.743-02-756929, 394.68(3,444.71)9-19-7421246,108.403-07-7521287,559.32(11,494.98)10-24-7412629,369.123-18-7512649,862.54(5,231.20)11-14-7419941,631.604-07-7519794,323.5911,119.6611-28-7412730,527.864-21-751 2765,718.9010,111.3212-16-745914,575.194-25-755930,592.755,634.1512-12-7410422,980.735-05-7510455,582.1412,415.1112-17-7417036,203.535-11-75169100,200.1031,349.73*450 In 1973 and 1974, R & O Cattle Company made the following cattle transactions: R & O CATTLE CORPORATION1973No. ofNo. ofDateCattleCost ofDateCattle SoldSelling PricePurchased(Feeder)CattleSold(Finished)of Cattle7-72127$35,623.291-73125$ 56,712.758-7211037,946.591-7310956,057.119-7219556,114.752-7319291,838.9612-721203 8,741.305-7311960,524.8710-7210027,828.295-7310047,707.211-7313941,884.698-7313475,148.601- 7312635,485.3711-7312264,565.523-7314452,697.4511-7314369,945.125-7314049,583.9912-7313867,042.1119746-7314850,734.851-7414690,320.843-7323475,571.762-74229148,158.7510-7310334,557.736-7410145,027.893-7411530,710.668-7411466,331.60In 1973 and 1974, the Irsik & Doll partnership made the following cattle transactions: 1973IRSIK & DOLL PARTNERSHIPNo. ofNo. ofDateCattleDateCattle SoldPurchased(Feeder)Sold(Finished)7-722081-732057-722272-732208-723151-733149-721923-7319110-722193-7321910-722454-7324512-72& 1-732156-732121-732026-731961-732297-732271-732469-732422-732389-732283-733179-733103-732089-732063-7324111-732403-7324111-732385-7322511-73223*451 1974IRSIK & DOLL PARTNERSHIPNo. ofNo. ofDateCattleCost ofDateCattle SoldSelling PricePurchased(Feeder)CattleSold(Finished)of Cattle6-73217581,569.591-742165113,515.267-7321576,032.481-74213104,669.047-7326195,263.272-74257140 ,421.569-73327110,517.984-74324155,408.059-7321483,012.644-74213111,855.1210-7321477,671.275-74212105,292.7310-7322381,893.205-74220108,454.7611-7319677,642.855-74196100,574.711-7419 076,554.096-7419088,009.0712-7320470,563.236-7420393,049.131-7420083,883.096-7419998,947.8 51-7420075,692.577-74198103,960.451-7425298,650.408-74247147,703.533-7420059,847.108-7419 9104,873.044-7418050,920.5210-7417985,718.885-7422658,546.3510-74226101,020.975-7420553,585 .3511-7420490,221.297-7420858,580.9511-7420787,576.425-7423358,684.7111-74233100,588.648-74 18351,712.381-7518382,839.559-7421051,399.061-7520986,942.799-7419040,324.492-7519074,19 8.1510-7421049,081.002-7521081,530.4010-7419544,461.772-7519476,894.509-7415231,572.152-7515260,149.1010-7420850,880.003-7520881,783.8810-7410825,100.113-7510840,840.4111-7418339,997.103-7518076,383.3811-7419752,075.623-7519687,893.5611-745010,100.284-754922,027.20*452 The following schedules show the number of finished cattle futures contracts held by petitioner on the dates indicated: 1973 (DAY TRADES) 3 AND SHORT TRADES Feb.Apr.JuneAug.Oct.Dec.Feb.1/11/31551/4501/501/1171/12(5)51/166291/18(5) 81/19(6)1/23551/2401/26(5) 051/29(5)1/301/3102/12/2(20)2/52/62/7(6)2/82/92/122/132/14(5)2/20(5)2/21(6)2/222/23( 5)2/26(6)2/27(3)2/283/2(10)(10)3/53/63/7(20)3/83/12(5)3/15(15)3/193/223/2 83/304/44/524/604/94/104/124/164/17(3)(5)4/184/194/244/254/264/27(10)4/3025/305/855/9195/10(10)5/11(40) 18(10)5/15(4) 285/17(10) 245/185/2305/2455/295/30246/456/506/6(5) 4(5)6/7(4)6/806/11(5)6/136/14(4)6/18106/21(8) 156/22196/26(25)6/29(5)7/507/16207/1707/207/25(10)7/31(10)8/6(9)8/78/158/17(5)8/228/238/278/288/309/69/12(4) 9/139/149/179/2110/4(4)10/8(12)10/92010/10(10)10/17010/1910/2210/2310/24(15)10/293010/31(13) 3211/2211/7011/16(1)11/26211/27511/28011/29011/30(2)12/412/14*453 1973 (DAY TRADES) AND LONG TRADES Feb.Apr.JuneAug.Oct.Dec.Feb.1/11/31/41/51/11(5) 21/1201/1751/18(5)1/19(6)1/231/2401/26(5)1/29(5) 151/30281/31402/1442/2(20) 64102/58452/61502/7(6) 53102/851502/94102/12442/134152/140(5)2/20(5)2/21(6) 132/220002/23(5)2/26(6)2/27(3)52/2803/2(10)(10)3/525203/63/7(20)3/8003/12(5) 103/15(15)3/1629353/19263/223/2824403/304/40004/54/62254/96 4/10004/1204/1684/17(3)(5)4/1804/1984/24124/2510 4/26194/2704/300(10)5/35/85/95/10(10)5/11(40)(10)5/15(4)5/17(10) 55/1805/2385/2425/2905/306/46/56/6(5)(5)6/7(4)6/86/11(5) 246/1306/14(4)6/186/21(8)6/226/26(25)6/29(5)7/57/1647/17207/20007/25(10)7/31(10)8/6(9)8/758/15108/17(5)8/2228/2308/2748/28058/3009/609/12(4)9/1310109/142509/17309/212510/410/8(4) 2010/90(12)10/10(10)10/17123010/192210/222010/23010/24(15)10/2910/31(13)11/2511/7011/16(1)11/2611/2811/2911/30(2) 412/4012/12512/145*454 1974 -- (DAY TRADES) AND SHORT TRADES Feb.Apr.JuneAug.Oct.Dec.Feb.Apr.1/81/141/151/161/171/181/2821/2901/30(5)2/852/14(8)2/15(7)2/22(9)2/25(5)3/13/503/63/15(2)3/26(2)4/44/195/165/175/23(5)5/2456/606/76/146/186/20(2)6/21(1)(1)6/267/97/107/117/157/177/22(2)(2)7/237/247/297/308/18/28/58/78/98/128/148/198/268/278 /289/39/69/1110/910/1110/1810/2311/1211/1411/18(2)11/202211/210011/2611/2912/2(2)12/1012/201974-- (DAY TRADES) AND LONG TRADES Feb.Apr.JuneAug.Oct.Dec.Feb.Apr.1/821/142 1/15041/1671/17951/1801/281/291/305(5)2/87102/14(82/15(7)2/22 (9)2/25(5)3/1003/573/653/15(2)3/26(2)4/44/704/1155/1625/17055/23(5)5/246/66/706/1436/1826/20(2)6/ 21(1)(1)6/2607/927/1027/1137/1557/1767/22(2)(2) 87/2397/24137/2947/30278/198/2118/5138/7298/9158/12178/14138/19148/26208/2778/2809/329/639/11010/9210/11510/18210/23411/12211/14411/18(2)011/20211/2111/26211/29012/22(2)12/10012/20*455 The following schedule shows petitioner's personal cattle holdings on the dates indicated: 1973ORINGDERFF PERSONAL CATTLE HOLDINGSTotalMonthlyMonthlyPurchasesCattleTotalTotalDate/ (Sales)HeldSoldPurchasedJan. 1, 197317111/2/73(205)15061/3/73+11116171/4/73+12017371/8/73(156)15811/9/73(124)1457 1/11/73+17316301/19/73+13117611/20/73(161)16001/23/73(110)14901/28/73(126)1364(882)+5352/3/73+124 + 165 +1752992/12/73(120)16322/22/73(118)1514(238)+3883/11/73+24117553/19/73+14018953/29/73(115)1780(115)+3814/13/73(269)1511(269)+ 05/1/73+11816295/8/73(98)15315/9/73(112)14195/14/73+15615755/15/73+12016955/17/73+147 18425/24/73+1281970(210)+6686/06/73(111)18596/11/73(131)17286/25/73+14218706/27/73(99)177 16/29/73+1391910(583)+2817/4/73(124)17867/5/73+14219287/6/73(165)17637/8/73(120)16437/21/73+1371780(409)+2798/1780(0)+ 09/9/73(241)15399/10/73(173)1366(414)+ 01001366(0)+ 011/13/73(140)122611/14/73(118)110811/22/73+ 93120111/28/73(147) (128)926(533)+ 9312/1/73+ 91101712/14/73(139) (142)73612/19/73+111847(281)+202*456 1974 ORINGDERFF PERSONAL CATTLE HOLDINGSTotalMonthlyMonthlyPurchasesCattleTotalTotalDate/(Sales)HeldSoldPurchasedJan. 1, 19748471/8/74+1019481/9/74+122 (120)9501/21/74(1427)8081/24/74( 156) +102754(418)3252/15/74( 137)617(137)03/7/74+1037203/21/74+ 59779( 0 )+1624/1/74+2009794/10/74+ 5210314/12/74+11611474/22/74+98 +98 +1991542( 0 )+7635/9/74( 91)14515/16/74+1121563( 91)+1126/21/74(101) ( 111)13516/27/74+1221473(122)+1227/4/74+10515787/6/74( 93)14857/18/74+10715927/22/74(122)1470(215)+2128/13/74(102)13688/17/74+10714758/22/74+ 9015658/27/74(103)1462(205)+1979/05/74(200)12629/06/74(116)11469/15/74( 98)10489/15/74( 98)9509/19/74+21211629/26/74+2161378(512)+42810/3/74+100147810/5/74( 59)141910/10/74+ 70148910/23/74(199)129010/24/74+1261416(258)+29611/10/74( 52)136411/13/74(112)125211/14/74+199145111/15/74(122)132911/28/74+1271456(286)+32612/12/74+104156012/16/74(107) (105)+ 59140712/17/74+170157712/26/74(107) ( 90)1380(409)+742*457 The following schedules show the number of cattle held by the Irsik & Doll partnership and the R & O Cattle Company on the dates indicated: IRSIK & DOLL PARTNERSHIP CATTLEHOLDINGS 1973TotalMonthlyMonthlyCattleTotalTotalDateHeldSoldPurchased1/1/7314061/731775(523)8922/731786(227)2383/732382(411)10074/732137(245)05/732362( 0 )2256/732162(417)2177/732409(229)4768/732409( 0 )09/731941(1009)51410/732378043711/731867(607)19612/732071( 0 )204IRSIK & DOLL PARTNERSHIP CATTLEHOLDINGS 19741/1/7420711/742484(430)8432/742223(261)03/742423( 0 )2004/742060(541)1805/742091(633)6646/741497(594)07/741505(200)2088/741236(452)1839/741788( 0 )55210/741995(406)61311/741779(646)4801973 R & O CATTLE COMPANY HOLDINGS1/1/736521/73680(237)2652/73485(195)03/73863( 0 )3704/73863( 0 )05/73783(220)1406/73931( 0 )1487/73931( 0 )08/73792(139)09/73792( 0 )010/73895( 0 )10311/73625(260)012/73485(140)01974 R & O CATTLE COMPANY HOLDINGS1/1/744851/74337(148)02/74103(234)03/74218( 0 )1154/74218( 0 )05/74218( 0 )06/74115(103)07/74115( 0 )08/740(115)0*458 Petitioner was not reimbursed by Ingalls Feedyard for any part of his commission costs incurred in futures trading in either 1973 or 1974. When petitioner purchased futures contracts with relation to cattle on hand, he counted as his cattle his personal cattle holdings combined with one-sixth (his interest in the partnership) of the Irsik & Doll partnership cattle and with 50 percent (his interest in the corporation) of the R & O Cattle Company cattle. When relating futures purchases to his expected feeder cattle needs, petitioner correlated his futures purchases to the number of feeder cattle he needed and not to the weight of feeder cattle he needed. In 1973 and 1974, Ingalls Feedyard charged its customers a fee for care and space for the cattle, plus the cost of feed. As manager of Ingalls Feedyard, petitioner was paid no salary. His compensation consisted of commissions based on the number of cattle sold from the feedyard.In 1973 and 1974, petitioner received commissions of $59,420.45 and $62,808.75, respectively, from Ingalls Feedyard. In each of these years he received a salary of $12,000 from R & O Cattle Company. Petitioner's partnership profits from the Irsik & Doll*459 partnership were $29,783.59 and $63,063.74 for the years 1973 and 1974, respectively. On Schedule F, Farm Income and Expenses, of his 1973 Federal income tax return petitioner reported a profit of $293,805.65 prior to his claimed deduction of $248,233.55 of "Hedging" loss, and on Schedule F of his 1974 return reported a loss of $13,717.06 prior to his claimed deduction of $76,972 of "Hedging" loss. 2Respondent in his notice of deficiency recharacterized those "Hedging" losses as capital with the following explanation: (a) It is determined that hedging losses of $248,233.55 claimed on your 1973 return, and $76,972.00 claimed on your 1974 return are not allowable under the provisions of Section 165 of the Internal Revenue Code of 1954; however, they are allowable as capital losses covered by Section 1211 of the Code. It has not been shown that these commodity transactions were not speculative in nature, *460 nor has it been shown that these transactions were tied to your personal sales and purchases of cattle. Accordingly, your taxable income is increased $248,233.55 for 1973 and $76,972.00 for 1974. OPINION Section 165(c)(1) and ( 2), I.R.C. 1954, 3 limits an individual's loss deductions to those incurred in a trade or business or a transaction entered into for profit. Section 165(f) limits the deductions for losses from the sale of capital assets to those provided for in sections 1211 and 1212. Section 1221 defines a "capital asset" as property held by a taxpayer and then enumerates several specific types of property to be excluded from that definition. Since futures contracts in commodities are not within the specific exclusions from section 1221, they generally will be considered capital assets.4Muldrow v. Commissioner,38 T.C. 907 (1962). An exception to the literal language of the statute exists where futures transactions are an integral part of a taxpayer's business. Such transactions result in ordinary gain or loss. Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955). *461 Petitioner maintains that he falls within the Corn Products exception to section 1221 because (1) his futures transactions were hedging transactions designed to minimize the risks of his cattle feeding enterprise, and (2) his futures transactions were necessary to keep him abreast with the market information needed in his positions as manager of the Ingalls Feedyard and as consultant for Gray County, as well as in marketing his own cattle. It is clear that petitioner's contact with the futures market did to some extent give him a needed source of information which he could use in marketing his cattle and in advising others on marketing their cattle. In our view, however, this fact does not strengthen petitioner's argument for application of the Corn Products exception. Leaving aside the difficulties of relating petitioner's interests as a manager, partner, shareholder and consultant in various cattle feeding operations to his interests as an individual cattle feeder, we consider the facts in this record to negate a direct relationship between petitioner's futures transactions and his need for market information. Certainly only a minimum number of purchases of futures*462 contracts would have gained for petitioner the information he contends he needed from the brokers from whom he purchased such contracts. Even had petitioner's purchases been so limited (clearly from the extensive futures trading in which he engaged in 1973 and 1974 they were not), he would not be entitled to deduct his losses as ordinary ones if his purchases were made with any substantial investment or speculative motive. See W. W. Windle Co. v. Commissioner,65 T.C. 694, 712-713 (1976). Petitioner testified that his trading levels in 1973 and 1974 were far above those in prior and following years. Although he offered an explanation of why his claimed hedging activities required a greater trading level in these years, he at no point in his testimony explained why his need for market information necessitated such increased trading. On the basis of this record we conclude that petitioner has totally failed to show a relationship between his numerous futures transactions and his need for up-to-date market information. It is doubtful whether the Corn Products case, supra, could properly be stretched to include futures contracts purchased to acquire market*463 information for use in a trade or business. This, however, is an issue we need not and do not here decide. This record shows that many of petitioner's futures transactions in the years here involved were opened and closed on the same day. This is a clear indication of a substantial investment or speculative motive. Therefore, the gains or losses do not constitute ordinary gains and losses because of any need petitioner had to keep abreast of the cattle market. W. W. Windle Co. v. Commissioner,supra.The primary issue in this case is whether petitioner's futures transactions were hedges or if not "true hedges" whether they were such an integral part of his business as to come within the exception to the definition of capital assets set forth in the Corn Products case. The record here shows unequivocally that petitioner's futures transactions were not "true hedges." One of petitioner's experts testified at length as to how a "true hedge" is made to protect against price fluctuations of finished cattle and of replacement feeder cattle. 5 In each instance, the purpose and the result of the hedge is to insure the profit of the cattle owner from the feeding*464 of the cattle as distinguished from profits or losses from price fluctuations. The schedules in our findings show no instances in which petitioner held either a short or long contract for a 120-day or longer period in either year here in issue. In 1973 the longest period petitioner held any futures contracts was 30 days and only one of his contracts was held that long. In 1974 petitioner held one contract for 35 days, one for 37 days, two for 42 days, two for 43 days, one for 49 days, one for 51 days, and one for 69 days before closing out. He held no futures contracts for longer than 69 days, and except as above set forth, closed all his futures contracts in 1974 in less than 30 days. In fact, the majority of his contracts in 1973 and 1974 were closed within 10 days or less. From this as well as the lack of correlation between petitioner's cattle purchases and sales and his futures transactions, it is clear that petitioner's futures transactions were not "true hedges." However, as was held in the Corn Products case, transactions which are a legitimate form of price protection against either increasing costs of raw products or decreasing prices of finished products are a form*465 of insurance so that the gains, if any, on the transactions are ordinary gains and the losses, if any, ordinary losses. Generally, this type of transaction has been referred to in various cases as a "hedge" or "partial hedge." Such "hedges" or "partial hedges" are an integral part of a taxpayer's business. However, futures transactions which are speculative or investment transactions result in capital gains or losses. Petitioner's contention in this case that his futures transactions were "hedges" apparently uses the term "hedges" to encompass any form of business-related price protection. For convenience, we will consider petitioner's contention by using the terms "hedge" or "hedging" to include any form of business-related price protection as distinguished from speculative or investment transactions. The nature of the futures transactions involved in any particular case is a factual issue to be determined from all the facts of record. *466 Respondent contends that long positions in fat cattle futures cannot be hedges against or integrally related to insuring against rising feeder cattle costs. Petitioner, citing Kurtin v. Commissioner,26 T.C. 958 (1956), argues that, because no viable feeder cattle futures market existed in 1973 or 1974, fat cattle futures were appropriate hedges against increases in feeder cattle prices. In Kurtin, we held that butter futures were an appropriate hedge against price fluctuations in cheese. Cheese futures were not available and butterfat was the principal ingredient common to butter, cheese and milk. Respondent argues that a correlation between finished and feeder cattle prices was not proven by petitioner as was the correlation between cheese and butterfat prices by the taxpayer in Kurtin. We disagree. Petitioner offered the testimony of expert witnesses to the effect that finished cattle futures were an appropriate price hedge for feeder cattle in 1973 and 1974 even though certain seasonal factors may affect the price of finished cattle but not affect feeder cattle prices. We conclude that the testimony of these experts showed a sufficient correlation*467 between the prices of finished and feeder cattle to support a conclusion that long positions in finished cattle futures could under proper circumstances be a legitimate hedging device for feeder cattle in 1973 and 1974. The record here shows that in some instances petitioner initially entered into short futures transactions at a time when such transactions might have been insurance of a "locked-in" profit on his feeder cattle. If these positions had been maintained by petitioner until either the cattle were sold or some circumstance occurred to indicate no further need for the protection, these futures transactions might fall within the Corn Products exception to the definition of a capital asset. In Corn Products, the taxpayer was a manufacturer of products made from corn, such as sugar or syrup. Generally, its products were sold pursuant to contracts calling for shipment within 30 days with the purchase price being the lower of market or a set figure. The Supreme Court explained the taxpayer's entrance into the futures market in Corn Products,supra at 48, as follows: In 1934 and again in 1936 droughts in the corn belt caused a sharp increase in the price*468 of spot corn. With a storage capacity of only 2,300,000 bushels of corn, a bare three weeks' supply, Corn Products found itself unable to buy at a price which would permit its refined corn sugar, ceralose, to compete successfully with cane and beet sugar. To avoid a recurrence of this situation, petitioner in 1937, began to establish a long position in corn futures "as a part of its corn buying program" and "as the most economical method of obtaining an adequate supply of raw corn" without entailing the expenditure of large sums for additional storage facilities. At harvest time each year it would buy futures when the price appeared favorable. It would take delivery on such contracts as it found necessary to its manufacturing operations and sell the remainder inearly summer if no shortage was imminent. If shortages appeared, however, it sold futures only as it bought spot corn for grinding. [Footnote omitted.] In this manner it reached a balanced position with reference to any increase in spot corn prices. It made no effort to protect itself against a decline in prices. Similarly, any long positions taken by petitioner to protect the price he would be required to pay for*469 the replacement feeder cattle which he would purchase, that were closed out when the replacements were purchased or when objective circumstances indicated a rise in the price of feeder cattle would not occur, might fall under Corn Products.The record shows, however, that the majority of petitioner's futures transactions were not the adoption, abandonment, or reversal of positions integrally related to his business. Most of petitioner's futures transactions were made in efforts to make a profit on the futures transactions themselves. Petitioner referred to these efforts as an attempt to improve his insured positions. For example, at the trial petitioner explained some of his transactions in the following manner: Q Is it not true that on January 3, 1973, yousold short 5 contracts of April cattle? A This is true. Q Did you lock in a profit by virtue of that short sale? A Yes, sir. Q If you locked in a profit on January 3rd, why did you close out the transaction on January 4? A It is very possible that I would have obtained information during the morning that the beef market was going to become stronger, and I would have an opportunity to increase a locked position*470 by removing it and replacing it at a later date, to increase the profits on that pen of cattle. Q Your statement, then, is that the reason you closed out the short position, was that your information indicated the market was going to go up with respect to live cattle? A True. Q Mr. Oringderff, again directing your attention to Page 1 of Exhibit 5-E, on January 18th you sold short -- 5 contracts of February cattle. Did you lock in a profit by virtue of that short sale? A Yes, I would have. Q And what was your reason, then, for closing out that short position? A It would undoubtedly be the same reason as I closed out the April contracts, because as I looked down the sheet, it's very -- Q Now, I'd like you to just answer the question. What was your reason for closing out the short sale opened on January 18th of five February contracts? A Because I undoubtedly had obtained information to indicate that this market was still trending upward, and that it would be possible for me to lock in additional profits to what I had locked in on this given date. Q So you again state that you closed out the short position because of information you had as to the trend of the market? *471 A Yes. 6In Muldrow v. Commissioner,38 T.C. 907, 913 (1962), we distinguished hedging from speculating as follows: A hedge, on the other hand, is not a transaction looking to a favorable fluctuation in price for the realization of profit on the particular futures contract itself, as in the case of a speculative or capital transaction, but is a form of insurance against unfavorable fluctuations in the price of a commodity in which a position has already become fixed or, as in the case of a producer such as a cotton grower, will become fixed in normal course and the sale liquidation, or use of the commodity is to occur at some time in the future. * * * As evidenced by the short-term nature of most of petitioner's transactions and his testimony*472 explaining why he traded so frequently, the majority of petitioner's transactions were made "* * * looking to a favorable fluctuation in price for the realization of profit on the particular futures contract itself. * * *" Petitioner's expert witnesses testified that moving in and out of the market based on projected market trends might be a more effective "hedge" than simply taking a position and not removing it until the protected cattle were purchased or sold. While petitioner's expert witnesses referred to moving in and out of the market on the basis of business judgment as to possible future market trends as a form of "hedging", we fail to see how such business judgment differs from the business judgment of a speculator or a legitimate capitalist. 7*473 For instance, when petitioner removed a long position because he thought the market would soon offer better price protection, he was at the mercy of the market. If the market did not move as he expected, petitioner upon re-entrance would have a worse, not a better, price protection position than before removing the "hedge." This is speculation. The many occasions when petitioner moved in and out of the futures market based solely on his judgment of the trend of futures prices are indicative that his transactions were primarily speculative rather than an integral part of his cattle business operation.Petitioner, while contending that his transactions were hedging, failed to give any satisfactory explanation of situations in which he was clearly "overhedged." 8 The most egregious of these occurred on February 2, 1973. On that day, petitioner owned 84 long February futures contracts, the right to purchase 3,108 (84 X 37) fat cattle at a set price in February. Because fat cattle futures are sold only for every other month, his February futures could be used to hedge March cattle purchases as well as February ones. Adding petitioner's personal cattle purchases in those months, *474 769 (381 + 388) to his share of the corporate purchases in those months, 185 (50 percent of 370), and to his share of the partnership purchases in those months, 208 (1/6 of 1,007 + 238), gives a total of 1,162 cattle. Thus, petitioner's futures positions could have protected almost three times as many cattle as were eventually purchased.*475 While some of petitioner's futures transactions in the years here in issue initially might have been for protection from fluctuations in cattle prices, the record before us is totally inadequate to show such to be the fact. Clearly, the majority if not all of petitioner's futures transactions were speculative so as to result in capital gains or losses. Petitioner testified only as to the general nature of his transactions.He did not explain the rationale of individual transactions. In fact, petitioner makes no argument for designating some of the transactions as capital and others as not. As for the non-cattle futures transactions of petitioner, we find that they too must be considered capital investments. Petitioner makes no argument for treatment of his losses on sugar or hog futures as ordinary and the record shows no relation between these transactions and petitioner's business. At trial, petitioner admitted that these transactions were speculative. Petitioner claims that the wheat and corn futures were purchased for price protection of his feed needs. The record, however, does not show such a relationship to exist. The record is not clear whether the feedyard charged*476 its customers a fixed price for feed or whether the customer was charged the prevailing price at the time his cattle consumed the feed. If the customer were charged a fixed price for feed, the feedyards, not its customers, needed price protection for feed. If the feed charged to the customer was based on the market price of grain at the time the cattle consumed the feed, petitioner has failed to show the relationship of his transactions in grain futures to the consumption of feed by his cattle. Decision will be entered for the respondent.Footnotes1. At least through the years 1973 and 1974, the specialized services, available today for staying abreast with the market movements, were not available. Thus, without his futures market contacts, petitioner would have had to rely on 3 to 4 hour-old reports available on radio and television. Because of their adversary roles, petitioner could not expect buyers to furnish him the information.↩*. The amount shown in the Gain or (Loss) column is the amount of Gain or (Loss) after payment of the commission charges.↩*. Finished cattle futures are sold only for a months of a onven year: February, April, June, August, October, and December. ** The amount shown in the Gain or (Loss) column is the amount of Gain or (Loss) after payment of the commission charges.↩*. The amount shown in the Gain or (Loss) column is the amount of Gain or (Loss) after payment of the commission charges.↩*. The amount shown in the Gain or (Loss) column is the amount of Gain or (Loss) after payment of the commission charges.↩*. The amount shown in the Gain or (Loss)column is the amount of Gain or (Loss) after payment of the commission charges.↩*. The amount shown in the Gain or (Loss) column is the amount of Gain or (Loss) after payment of the commission charges.↩*. The amount shown in the Gain or (Loss) column is the amount of Gain or (Loss) after payment of the commission charges.↩*. Feed and Interest Costs are Included.↩3. Day trades are positions opened and closed on the same day and petitioner kept no record to indicate whether a given day trade was opened as a short or long position; apparently, his broker also does not have this information. The numbers in ( ) indicate day trades.↩2. This reported loss apparently should have been $19,196.90 since in his notice of deficiency respondent determined that petitioner's cattle sales for 1974 were overstated by $5,479.74 and reduced petitioner's income as reported accordingly.↩3. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here involved. ↩4. Sec. 1233 contains special provisions with respect to gains and losses from short sales. Sec. 1233(a) provides: SEC. 1233. GAINS AND LOSSES FROM SHORT SALES. (a) Capital Assets.--For purposes of this subtitle, gain or loss from the short sale of property shall be considered as gain or loss from the sale or exchange of a capital asset to the extent that the property, including a commodity future, used to close the short sale constitutes a capital asset in the hands of the taxpayer. Sec. 1233(g) provides: (g) Hedging Transactions.--This section shall not apply in the case of a hedging transaction in commodity futures.↩5. The following examples of hedging against price fluctuations of finished cattle were given by petitioner's expert witness: Table 1. Hedging Example - When Prices Decline [SEE TABLE IN ORIGINAL] Table 2. Hedging Example - When Prices Advance [SEE TABLE IN ORIGINAL] This witness testified that if the protection sought was for the replacement of feeder cattle after the 140-day fattening period, the same procedure would be followed except instead of a short sale of fat cattle, the hedger would purchase feeder cattle futures, taking a long position.↩6. Compare Meade v. Commissioner,T.C. Memo. 1973-46, 32 TCM 200, 210, 42 P-H Memo. T.C. par. 73-205, 73-213, wherein we found the following testimony by the taxpayer to be determinative of speculation: If I thought the cattle market was going to get higher, I could step in and buy a few contracts long, if the market goes up 50 cents, or so, I could pick up that to cheapen down my feeder cattle.↩7. In U.S. v. New York Coffee and Sugar Exchange, Inc.,263 U.S. 611, 619 (1924), the Supreme Court explained that: Those who deal in "futures" are divided into three classes: first, those who use them to hedge, i.e., to insure themselves against loss by unfavorable changes in price at the time of actual delivery of what they have to sell or buy in their business; second, legitimate capitalists who, exercising their judgment as to the conditions, purchase or sell for future delivery with a view to profit based on the law of supply and demand; and, third, gamblers or irresponsible speculators who buy or sell as upon the turn of a card. * * *↩8. Respondent argues that petitioner was not justified in hedging feeder cattle with an equal number of fat cattle because fat cattle weigh more than feeder cattle. Respondent insists that in determining whether petitioner was overhedged we should view petitioner's long positions in fat cattle futures as relating to the weight of the feeder cattle he needed. Petitioner testified that he related fat futures contracts to the number of feeder cattle he needed. Petitioner's expert witnesses testified that although by-weight hedging was preferable, by-number hedging was not unreasonable. Because he would never take delivery of the fat cattle, petitioner argues that a by-numbers hedge was appropriate. Since even on a by-numbers basis we find petitioner was overhedged in a number of instances, we have made our comparison of the number of feeder cattle needed with the number of fat cattle represented by futures contracts in determining whether petitioner was overhedged. Respondent also argues that in determining whether petitioner was overhedged, we should measure petitioner's futures contracts against only his cattle and not the cattle of his corporation or his partnership. Even if the record otherwise showed an integral relationship between petitioner's cattle business and his futures transactions, the gain or loss on those transactions entered into for price protection of cattle owned by the partnership and corporation would result in capital losses. Petitioner's interest in those cattle is one of a capital investor in an entity which owns the cattle. Boone v. U.S.,374 F. Supp. 115↩ (D.N.D. 1973). Losses incurred to protect a capital investment would be capital losses. Petitioner makes no argument for ignoring the partnership or corporate entity for hedging purposes, and we perceive no reason for so doing. However, even if we compare petitioner's futures transactions to the cattle he owned, plus his proportioned share of the corporate and partnership cattle, this record shows a number of instances in which petitioner was "overhedged."